BALMORAL CINEMA, INC.,
Plaintiff–Appellant,

v.

ALLIED ARTISTS PICTURES CORP.,
et al., Defendants–Appellees.

No. 87–6094.

United States Court of Appeals,
Sixth Circuit.

Argued March 28, 1989.

Decided Sept. 13, 1989.

See also, 673 F.Supp. 219.

Lawrence G. Papale (argued), San Francisco, Cal., Barry Kuhn, Memphis, Tenn., and Carl Olson, for plaintiff-appellant.

Walter P. Armstrong, Jr., Goodman, McBride & Prewitt, Memphis, Tenn., Phillip A. Wittmann (argued), Wittmann & Hutchinson, New Orleans, La., Paul E. Prather, Memphis, Tenn., and S. Russell Hedrick, for defendants-appellees.

Before MERRITT and NELSON, Circuit Judges, and LIVELY, Senior Circuit Judge.

MERRITT, Circuit Judge.

This antitrust case presents a new issue in this Circuit: whether participation by movie distributors in an exhibitor motion picture split agreement establishes a "group boycott" which gives rise to *per se* liability under § 1 of the Sherman Act. Specifically, plaintiff-appellant, Balmoral Cinema, Inc. ("Balmoral") challenges the trial court's instruction to the jury that the conduct of the distributor-defendants be evaluated under the rule of reason rather than the *per se* standard. Because we believe that the District Court properly instructed the jury, we affirm.

## I.

From October 15, 1975, until December 31, 1977, plaintiff Balmoral Cinema, Inc., owned and operated an independent theatre which exhibited motion pictures in the Memphis, Tennessee area. The corporation was formed by Frank C. Warner with the hope of exhibiting first-run films in the Memphis area. Balmoral alleges practices labeled "group boycotts" by two groups of defendants—the other first-run motion picture exhibitors in the Memphis area and distributors who supply first-run motion pictures to exhibitors in the Memphis area. Balmoral alleges that defendants participated in a split arrangement which effectively eliminated Balmoral from the market for first-run films in the Memphis area.

In the film industry, there are three levels from creation to exhibition of a motion picture. Producers are responsible for actually creating the film itself (e.g., scripting, casting, filming). Distributors are responsible for developing marketing strategies and licensing films to exhibitors. Exhibitors, after negotiating licensing arrangements with the distributors, display the films in their theatres. For a detailed discussion of the operation of the film industry and split agreements, see *United States v. Capitol Service, Inc.*, 568 F.Supp. 134, 136–38 (E.D.Wis.1983), *aff'd*, 756 F.2d 502 (7th Cir.), *cert. denied*, 474 U.S. 945, 106 S.Ct. 311, 88 L.Ed.2d 288 (1985); and *Southway Theatres v. Georgia Theatre Co.*, 672 F.2d 485, 488–90 (5th Cir.1982).

Split arrangements relate to the manner in which licenses are negotiated between the exhibitors and distributors. Without a split, licenses might be negotiated through a competitive bidding process. Exhibitors, at the invitation of the distributors, would bid on soon-to-be released motion pictures. To win a bid, exhibitors would usually be required to put up large cash guarantees and accept other unfavorable terms. Splits were designed to avoid these unfavorable terms.

A split is a kind of informal exclusive dealership arrangement for individual films. It is an agreement between two or

more exhibitors in a given market not to compete against each other in the licensing of films from distributors. Specifically, Balmoral claims that the exhibitors participating in the Memphis area split met periodically to allocate among themselves the right to bid on specific films offered by the distributors. This practice lessened competition, Balmoral says, by eliminating the possibility of competitive bidding that would normally have taken place. Under the arrangement, the split member to whom a particular film was allocated would be the only member of the group who would bid on the picture. The distributors participated in the split, Balmoral alleges, by advising the split members of which theatre they wanted to exhibit their particular films, by rejecting bids submitted by Balmoral in favor of those of split members (often submitted orally), and by making split members rework a particular split allocation if a particular distributor was not satisfied with the result. Indeed, Balmoral claims, probably correctly, the split could not have operated without distributor participation.

Balmoral filed suit in 1977 alleging, *inter alia*, that the split violated § 1 of the Sherman Act, 15 U.S.C. § 1 (1982).[1] After lengthy proceedings including transfer by the multidistrict litigation panel to another district for consolidated discovery with eight other then pending motion picture industry anti-trust cases, and settlement by all the exhibitors and one distributor, the case went to trial on the claim that the distributors participated in the split and that such participation violated § 1 of the Sherman Act and caused injury to Balmoral's business.

After more than three weeks of trial, the jury returned a special verdict for defendants, answering "No" to the following interrogatory:

Did any motion picture distributor enter into any agreement ... which constituted an unreasonable restraint of trade in violation of the antitrust law and

which proximately caused injury to the movie business of the plaintiff, Balmoral Cinema, as these terms are defined in the Court's instructions?

Trial Tr., Vol. III at 480. Balmoral appeals, challenging the trial court's refusal to instruct the jury that a split agreement of the type alleged herein is a *per se* violation of the Sherman Act and that courts' use of a rule of reason instruction instead.

## II.

Section 1 of the Sherman Act provides in pertinent part:

[e]very contract, combination ... or conspiracy in restraint of trade or commerce among the several States ... is declared to be illegal.

15 U.S.C. § 1 (1982). Recognizing that almost every contract can technically be said to restrain trade, the Supreme Court interpreted the statute as condemning only those combinations which constitute unreasonable restraints of trade. *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). The standard for determining whether a restraint is unreasonable is elusive. Often such a determination involves a complex, time-consuming, costly inquiry into the purposes of the restraint and its likely effect on competition in the market in question. This inquiry is dubbed the "rule of reason" standard.

Some restraints, however, either on their face or from experience, appear so bad and so unlikely to produce any pro-competitive effects, that courts deem it unnecessary and a waste of resources to engage in the complicated rule of reason analysis. Such restraints are viewed as naked restraints of trade and are declared illegal *"per se."*

Balmoral argues that the restraint alleged here is a group boycott/refusal to deal and a market allocation. Balmoral says it is the same type of restraint that the Supreme Court held to be *per se* illegal in *Klor's, Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

---

1. Section 1 of the Sherman Act provides in pertinent part:

[E]very contract, combination ... or conspiracy in restraint of trade or commerce among the several States ... is declared to be illegal.

The distributors, on the other hand, argue that even assuming *arguendo*, that an agreement existed between the exhibitors and the distributors, the agreement constituted no more than a vertical non-price restraint, which the Supreme Court in *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988), held was properly analyzed under the rule of reason. The distributors further argue that even if an agreement existed which restrained trade, Balmoral was not injured thereby. Indeed, the distributors argue that Balmoral gained competitive advantages by not participating in the alleged split. These advantages include a decrease in the cost to license films and a significant reduction of the number of exhibitors against which Balmoral was required to compete. Moreover, the distributors allege that mismanagement rather than the split caused Balmoral to lose money.

### III.

Balmoral seems correct in its position that the alleged combination is more akin to practices labeled a "group boycott" or "concerted refusal to deal" than to a vertical non-price restraint. Balmoral alleges, in essence, that the first-run motion picture exhibitors, with the consent of the distributors, collectively decided to bypass competing for films and to allocate all the first-run motion pictures among themselves. It does not follow, however, that the conduct of the distributors, the only remaining defendants, constitutes a group boycott which is *per se* illegal.

In *Klor's, supra,* the Supreme Court held that group boycotts constitute *per se* violations of § 1 of the Sherman Act. 359 U.S. at 212, 79 S.Ct. at 709. Since that time, however, the Court has retreated far from that position. In *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985), the Court declined to hold that group boycotts/concerted refusals to deal were *always per se* violations of antitrust law. Indeed the Court said that application of the *per se* rule turns on whether the practice facially

appears, always or almost always, to tend to restrict competition and decrease output or rather to increase efficiency and competition. *Id.* at 290, 105 S.Ct. at 2617; *see also National Collegiate Athletic Ass'n v. Board of Regents of University of Oklahoma*, 468 U.S. 85, 103–04, 104 S.Ct. 2948, 2961, 82 L.Ed.2d 70 (1984); *Broadcast Music, Inc. v. Columbia Broadcasting Systems*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562–63, 60 L.Ed.2d 1 (1979). And in *FTC v. Indiana Federation of Dentists,* the Court, citing *Northwest,* observed:

> the *per se* approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor....

476 U.S. 447, 458, 106 S.Ct. 2009, 2017, 90 L.Ed.2d 445 (1986). *Per se* analysis should not be extended "to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious...." *Id.* at 459, 106 S.Ct. at 2018. That is the situation we have here.

The District Court was correct under these current Supreme Court authorities when it put the case to the jury under a rule of reason instruction. Here we are dealing with group conduct originated by the *purchasers* of films—the exhibitors, not by the sellers. The sellers responded to the purchasers' conduct by consenting to sell films to purchasers engaged in a group buying program. Balmoral does not allege that the split was formed to drive it out of business. Rather, Balmoral asserts that the purpose of the conspiracy was to establish and maintain artificially high prices. *See* Complaint, ¶ 28, J.A. at 11. Based on the record before us, this claim may well be incorrect. The practice at issue does not facially appear always or almost always to restrict competition, decrease output and raise prices. Rather it may simply lower prices paid by exhibitors to distributors and hence indirectly to producers in a market where the distributors and the producers have historically wielded great market power over film products at the expense of exhibitors. Exhibitors, as purchasers of films, may be justified in combating the market power of film suppliers by group

action. Such action may lower prices to moviegoers at the box office and may serve rather than undermine consumer welfare.

Finally, we are hard pressed to apply a *per se* standard to an alleged conspiracy which may be of little or no benefit to those accused of conspiring—namely the defendant distributors. Decreased competition in bidding among exhibitors as purchasers of film, on the surface at least, would seem to produce lower licensing fees and, therefore, decreased profitability to distributors rather than, as Balmoral alleges, higher prices. Thus we cannot say that the conduct of the distributors in tacitly consenting to split agreements by purchasers of films was *per se* anti-competitive or harmful to consumers. This uncertainty about the economic effects of the split leads us, as it led the District Court, to reject a *per se* rule in this case.

### IV.

We find, therefore, that the District Court properly instructed the jury to use the rule of reason analysis in deciding Balmoral's claim. The judgment of the District Court is, therefore, AFFIRMED.