**MONSANTO COMPANY, Plaintiff,**

v.

**William TRANTHAM, Defendant.**

**No. 00–2656 M1/BRE.**

United States District Court,
W.D. Tennessee,
Western Division.

Aug. 16, 2001.

---

Glen G. Reid, Jr., Wyatt Tarrant & Combs, Memphis, Douglas P. Matthews, Joel E. Cape, Wayne K. McNeil, Frilot Partridge Kohnke & Clements, New Orleans, LA, Miles P. Clements, Frilot Partridge Kohnke & Clements, New Orleans, LA, Gregory E. Upchurch, Thompson Coburn LLP, St. Louis, MO, for F/N/A Monsanto Company, f/n/a Monsanto Company, Monsanto Company, plaintiffs.

Jim Waide, Waide & Associates, P.A., Tupelo, MS, for William Trantham, defendants.

**ORDER DENYING DEFENDANT'S MOTION TO SUBSTITUTE EXPERTS ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ORDER DISMISSING DEFENDANT'S COUNTERCLAIMS**

McCALLA, District Judge.

Before the Court are Defendant's Motion To Substitute David W. Parvin, Jr., As

An Expert In Lieu Of Leroy Davis, filed on June 14, 2001, and Plaintiff's Motion For Summary Judgment filed on May 14, 2001. For the reasons stated herein, Defendant's Motion To Substitute Experts is DENIED. In addition, Plaintiff's Motion For Summary Judgment is GRANTED, and Defendant's counterclaims are DISMISSED.

## I. Facts

This case stems from Plaintiff's patents on technology that allows a seed producer of cottonseed and soybeans seeds[1] to insert genes into the seed to make the resulting plants resistant to glysophate herbicides, such as Roundup herbicide, a product manufactured by Plaintiff. Seeds with the patented technology are called Roundup Ready®. A grower using the Roundup Ready® seed can spray his crops with the Roundup herbicide, or another glysophate herbicide, thereby killing the weeds in his field without damaging his crops. The technology can also be injected into cottonseed to make the resulting cotton plants insect repellant. Cottonseed using the technology is called Bollgard® Cotton. Cottonseed containing both versions of the technology is called Bollgard® with Roundup Ready® Cotton. Plaintiff's Roundup Ready® and Bollgard® gene technology is protected by three patents, which were issued prior to the events giving rise to this controversy. Plaintiff sells the gene technology to seed producers under a license to use the technology in the production of cottonseed and soybeans. The seed producers then sell the seed treated with the technology to retailers or to growers, both of whom must obtain licenses from Plaintiff before selling or using the seeds with the Roundup Ready® or Bollgard® technology. The license

agreement does not require the seed producers or retailers to sell the seed developed with the Monsanto technology at any specific price nor does the license restrict the grower or the retailer from selling conventional types of seed.

In order for an individual farmer to use seed produced with the patented gene technology, the farmer must be licensed to use the product. Under the licensing arrangement, a grower is only allowed to use the technology in one growing season and is prohibited from saving for later planting any of the seed produced from plants grown using the purchased seed. The grower is also prohibited from selling saved seed or transferring the seed to anyone else for planting.

Although the gene technology is covered by several patents, the operative patent for the purposes of this case is U.S. Patent No. 5,352,605 (the " '605 patent"). Claims 1 and 4 of the '605 patent are the claims covering the Roundup Ready® and Bollgard® gene technology. Claims 1 and 4 of the '605 patent are as follows:

1. A chimeric gene which is expressed in plant cells comprising a promoter from a cauliflower mosaic virus, said promoter selected from the group consisting of a CaMV (35S) promoter isolated from CaMV protein-encoding DNA sequences and a CaMV (19S) promoter isolated from CaMV protein-encoding DNA sequences, and a structural sequence which is heterologous with respect to the promoter.

4. A plant cell which comprises a chimeric gene that contains a promoter from cauliflower mosaic virus, said promoter selected from the group consisting of a CaMV (35S) promoter and a CaMV

---

1. The term "soybeans" in this Order generally refers to soybeans used as seed and not for other agricultural or commercial purposes.

(19S) promoter, wherein said promoter is isolated from CaMV protein-encoding DNA sequences, and a structure sequence which is heterologous with respect to the promoter.

This gene technology can be inserted into any cotton or soybean plant variety.

Defendant is a farmer in Tipton County, Tennessee. Defendant has never obtained a license from Plaintiff to use its technology in cottonseed. In 1999, Defendant purchased, along with James Wood, approximately 900 bushels of cottonseed from the Burlison Gin, located near Covington, Tennessee. Defendant then used that seed to plant over 100 acres of land with cotton seed. Defendant applied Roundup herbicide over the cotton, some of which was killed. In 2000, Defendant used seed purchased from the Burlison Gin to plant his cotton crops and again applied Roundup herbicide to the crop.

Defendant also purchased soybeans in 1999 from a retailer named Terra Seed and Chemical Company.[2] Defendant planted and harvested the soybeans in 1999, and then planted his 2000 crop with soybeans saved from the previous year's harvest.

Plaintiff was granted leave by this Court to enter Defendant's land to collect samples of the cotton and soybean crops to be tested for the presence of the Roundup Ready® and Bollgard® gene technology. Plaintiff used three separate testing procedures on the cotton and soybean crops, and detected Plaintiff's patented gene technology in 93% of the cotton samples and 100% of the soybean samples.

## II. Summary Judgment Standards

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). So long as the movant has met its initial burden of "demonstrat[ing] the absence of a genuine issue of material fact," *id.* at 323, 106 S.Ct. 2548, and the nonmoving party is unable to make such a showing, summary judgment is appropriate, *Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir.1989). In considering a motion for summary judgment, "the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." *Kochins v. Linden–Alimak, Inc.*, 799 F.2d 1128, 1133 (6th Cir.1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

When confronted with a properly-supported motion for summary judgment, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 250 (6th Cir.1998). A genuine issue of material fact exists for trial "if the evidence [presented by the nonmoving party] is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one

---

**2.** Defendant argues that Mark McLain, the retailer from whom he purchased the soybeans, signed Defendant's name to the technology agreement. Plaintiff does not appear to dispute this point.

party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

### III. Discussion

There are three principal issues before the Court: (1) whether to allow Defendant to substitute Dr. Parvin for Dr. Davis as an expert witness, (2) Plaintiff's motion for summary judgment on Defendant's counterclaims, and (3) Plaintiff's motion for summary judgment on Plaintiff's claims of patent infringement. The Court will address each issue in turn.

### A. Defendant's Motion To Substitute Experts

■ As an initial matter, the Court must address Defendant's Motion To Substitute David W. Parvin, Jr., As An Expert In Lieu Of Leroy Davis, filed on June 14, 2001. Defendant moves the Court to allow him to substitute Dr. Parvin for Dr. Davis as an expert in economics to provide expert testimony on Defendant's antitrust counterclaims. For the reasons stated below, the Court DENIES this motion.

The deadline for submitting expert reports in this case was originally set for February 5, 2001. On February 1, 2001, the Court entered an order granting Plaintiff's motion to extend the deadline for disclosure of expert reports to February 28, 2001. On March 1, 2001, the Court again extended this deadline to March 7, 2001, this time at the request of Defendant. Also on March 1, 2001, the Court extended the discovery cutoff date from March 30, 2001, to April 13, 2001, and reset the deadline for filing motions for summary judgment to April 30, 2001. On April 16, 2001, the Court granted Defendant's motion to extend the deadline for expert depositions from April 16, 2001, to April 30, 2001, and reset the deadline for filing motions for summary judgment to May 14, 2001. On April 26, 2001, Plaintiff took the deposition of Defendant's expert economist Dr. Leroy Davis. The deposi-

tion demonstrated that Dr. Davis did not have sufficient knowledge of antitrust issues to provide expert testimony on Defendant's antitrust counterclaims. (Def.'s Mot. To Substitute Experts ¶ 3.) On April 30, 2001, Defendant filed a notice of withdrawal of Dr. Davis as an expert witness. Plaintiff then filed a motion for summary judgment on May 14, 2001. Six and one-half weeks after Defendant withdrew Dr. Davis as an expert witness and over three months after the extended date for disclosure of expert witnesses, Defendant filed the present motion to substitute experts.

In the motion, Defendant argues that there is no prejudice to Plaintiff by the substitution since the claims presented in this case are substantially similar to those in *Monsanto v. McFarling,* Case No. 4:00–CV84–CDP in the Eastern District of Missouri, in which Defense counsel offered Dr. Parvin as an expert on antitrust issues in a preliminary injunction hearing. As a courtesy to the Court, Defendant included Dr. Parvin's testimony at the preliminary injunction hearing in support of his motion to substitute. The Court notes, however, that Defendant failed to include or make any mention of the portion of the transcript from the preliminary injunction hearing in which counsel for Defendant withdrew Dr. Parvin as an expert. The transcript from those proceedings reveals that counsel for Defendant stated after the conclusion of Dr. Parvin's testimony, "until this hearing today, in my blissful ignorance, I thought Professor Parvin would make us a competent economic expert. I believe it's now necessary for us to get another expert." (Tr. of Hrg. on Prelim. Inj., *Monsanto v. McFarling,* Vol. 3, pp. 123–24). The implication of this statement is that counsel for Defendant discovered in the preliminary injunction hearing in *McFarling,* just as he did in the deposition of Dr. Davis, that Dr. Parvin was not

qualified to offer the opinion testimony needed to support Defendant's antitrust counterclaims. Furthermore, counsel for Defendant knew that Dr. Parvin would not be useful in this case on April 17, 2001, the date of the preliminary injunction hearing in *McFarling.* Rather than again asking the Court for additional time to designate a new expert witness and/or for a continuance of the trial date, Defendant merely asked the Court to allow the substitution of defense experts a mere five weeks before trial and the day before he submitted a response to Plaintiff's motion for summary judgment relying on Dr. Parvin's analysis.

Finally, Defendant failed to comply with Local Rule 7.2(a)(1)(B), which requires that every motion, except for motions under Rules 12, 56, 59, and 60 of the Federal Rules of Civil Procedure, be accompanied by a certificate of consultation that lists the individuals consulted, the date consulted, and the manner of the consultation. Failure to comply with this rule may be deemed good cause for denying the motion.

Therefore, because (1) the motion to substitute expert witnesses was filed well beyond the date for disclosure of expert reports, (2) the requested substitute expert had been withdrawn as an expert on the same issues in a similar case by the same defense counsel, and (3) for failure to follow the local rules, the Court DENIES Defendant's Motion To Substitute David W. Parvin, Jr., As An Expert In Lieu Of Leroy Davis.

**B. Plaintiff's Motion For Summary Judgment On Defendant's Counterclaims.**

Defendant filed several counterclaims in his Amended Answer, some of which were dismissed by this Court in the Order Granting In Part And Denying In Part Plaintiff's Motion To Dismiss Defendant's Amended Counterclaim, entered on April 18, 2001. The counterclaims that were not dismissed were claims of monopolization, attempted monopolization, conspiracy to monopolize, and unreasonable restraint of trade. Plaintiff moves the Court for summary judgment on all of Defendant's remaining counterclaims.

**1. Monopolization**

In order to maintain an antitrust action for monopolization, an antitrust plaintiff must assert "(1) the possession of monopoly power in the relevant market [by the antitrust defendant], and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 596 n. 19, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985) (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 570–571, 86 S.Ct. 1698, 16 L.Ed.2d 778, (1966)). The first question that must be addressed is the relevant market in which the alleged monopolizer has monopoly power. The determination of the relevant market includes a product market test and a geographic market test. *White and White, Inc. v. Am. Hosp. Supply Corp.,* 723 F.2d 495, 500 (6th Cir.1983). The determination of the relevant market is a question of law for the Court. *Id.* at 499. The Court applies the legal test to the facts of the particular case to determine the relevant market. *Id.* The Court then determines whether the alleged monopolizer has monopoly power in the relevant market.

In considering the test for the relevant market, the Supreme Court has held that

The "market" which one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration. The tests

are constant. That market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered.

*United States v. E.I. du Pont de Nemours and Co.,* 351 U.S. 377, 404, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). The product market can be evaluated by either "(1) the product uses, i.e., whether the substitute products or services can perform the same function, and/or (2) consumer response (cross-elasticity); that is, consumer sensitivity to price levels at which they elect substitutes for the defendant's product or service." *White and White,* 723 F.2d at 500. The Sixth Circuit has held that the determination of the geographic market requires that "[t]he area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies." *Id.* at 501 (quoting *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961)). Once the relevant market is determined, the Court must determine whether the alleged monopolizer has monopoly power within that market. *Aspen Skiing,* 472 U.S. at 596 n. 19, 105 S.Ct. 2847. Monopoly power is defined as the "power to control prices or exclude competition." *du Pont,* 351 U.S. at 391, 76 S.Ct. 994. Courts often look to market share to determine whether an alleged monopolist actually has monopoly power since determination of monopoly power rests on an analysis of complicated economic factors. *Am. Council of Certified Podiatric Physicians and Surgeons v. Am. Bd. of Podiatric Surgery, Inc.,* 185 F.3d 606, 622 (6th Cir.1999).

Turning to Defendant's claims of monopolization of the U.S. markets for cottonseed and soybeans, there does not appear to be any proof in the record that delineates the relevant market. The record is virtually silent on the issue of the appropriate geographic and product markets for determination of the relevant market and monopoly power. Defendant argues in his Response To Plaintiff's Motion For Summary Judgment that the relevant market "could not possibly be any broader than the United States market for soybeans." (Def.'s Resp. To Mot. For Summ. Judg. at 17.) However, without a determination of the relevant market, there is no ability to determine whether an antitrust defendant has monopoly power.[3] *Intergraph Corp. v. Intel Corp.,* 195 F.3d 1346, 1355 (Fed.Cir. 1999) ("Defining the relevant market is an indispensable element of any monopolization or attempt case, for it is the market in which competition is affected by the as-

---

**3.** Plaintiff moves the Court for summary judgment on the grounds that Defendant's counterclaims must fail because he can present no expert proof on his antitrust claims. Plaintiff cites to cases in the Court of Appeals for the Eleventh Circuit holding that expert proof is required in antitrust cases. *Colsa Corp. v. Martin Marietta Servs., Inc.,* 133 F.3d 853, 855 n. 4 (11th Cir.1998). Other circuits have held that expert proof is not necessarily required. *General Indus. Corp. v. Hartz Mountain Corp.,* 810 F.2d 795 (8th Cir.1987) (evidence established relevant market without expert testimony); *Bacchus Indus., Inc. v. Arvin Indust.,* 939 F.2d 887, 894 (10th Cir.1991) (lay witness testimony established market

share). It appears that the Sixth Circuit has not yet resolved this issue. The Court notes that generally speaking, expert proof is required to prove antitrust claims merely because the knowledge of the markets required to prove such a claim is generally beyond that of a lay person and the level of analysis needed to assist the Court in determining the relevant market is outside the reach of most lay persons. However, the Court need not reach a final decision on the merits of Plaintiff's claims as to the relevant market since Defendant cannot meet either prong of the test for monopolization under any market definition advanced in this case.

serted predatory or anticompetitive acts"). There has been no proof presented by Defendant to show the relevant product market through either the reasonable substitute test or the cross-elasticity of demand test, as articulated in *White and White.* Nor has there been any proof as to the geographic market. The only proof put forward is that Plaintiff owns three seed producers of soybeans and no seed producers of cottonseed. As such Plaintiff has roughly a 20–30% share of the U.S. soybean seed production market and no share of the cottonseed production market. (Adams Dep. at 138–39; Rhylander Dep. at 336–37.) Rather than selling 100% of the seeds with the patented technology itself, Plaintiff licenses its technology to seed producers who produce seed using the technology and sell it to individual farmers subject to the terms of the license agreements. Generally, 20–30% and 0% market shares are insufficient to meet the standards of monopoly power in a relevant market. *Podiatric Physicians,* 185 F.3d at 623 (monopoly power sometimes found with a market share of over 50% and market share of over 70% has been held to be strong evidence of monopoly power). Therefore, Defendant cannot prevail on his claim of monopolization because he cannot meet the first prong of the test for monopolization.

Defendant argues that the Supreme Court's analysis in *Fortner Enterprises, Inc. v. United States* relieves Defendant of showing the relevant market so long as a claim for monopolization can be made under the rule of reason test. However, *Fortner* was a tying case, not a monopolization case. Tying and monopolization are separate antitrust causes of actions, tying being a violation of 15 U.S.C. § 1 while monopolization is a violation of 15 U.S.C.

§ 2. *Eastman Kodak,* 504 U.S. at 459, 112 S.Ct. 2072 (delineating the claims for tying and monopolization as arising under separate sections of the Sherman Act). Therefore, the passage from *Fortner* relied upon by Defendant is unavailing since it relates to a tying violation under § 1, not a monopolization violation under § 2. Furthermore, Defendant's argument that Plaintiff is tying the sale of one year's seed to the next year's seed through the restrictive licensing agreement is no longer a cause of action in this litigation since that claim was dismissed in the Court's order entered on April 18, 2001. (Order Granting In Part and Denying In Part Plaintiff's Mot. To Dismiss Def.'s Am. Countercl. at 13–14.) Taking all the facts and reasonable inferences from the facts in Defendant's favor, it is clear that Defendant has failed to put forward any proof to show the relevant market or Plaintiff's monopoly power within the relevant market. As such, Defendant cannot meet the first prong of a claim of monopolization.

 Turning to the second prong of the monopolization test, there is no proof that Plaintiff has willfully acquired or maintained monopoly power other than through the development of a superior product that has been successfully patented. The only proof is that Plaintiff introduced into the market a patented technology that has been warmly received by the seed producers, retailers, and individual farmers.[4] Quick growth through market demand does not constitute a willful acquisition of monopoly power. *Aspen Skiing Co.,* 472 U.S. at 596 n. 19, 105 S.Ct. 2847. Accordingly, Defendant's monopolization counterclaim must fail since Defendant can meet neither prong of the test for violation of § 2 of the Sherman Act for monopoliza-

---

**4.** Even Defendant's Response to Plaintiff's Motion For Summary Judgment states "[i]t is no doubt true that Monsanto has obtained

much of this huge market share through the superiority of its product." (Def.'s Resp. at 18.)

tion. The Court, therefore, GRANTS Plaintiff's motion for summary judgment and DISMISSES Defendant's monopolization counterclaims.

### 2. Attempted Monopolization

■ Defendant has also alleged that Plaintiff has violated 15 U.S.C. § 2 by attempting to monopolize the United States markets for cottonseed and soybeans. Attempted monopolization requires a showing of "(1) [s]pecific intent to monopolize; (2)[a]nti-competitive conduct; [and] (3)[a] dangerous probability of success." *White and White*, 723 F.2d at 506. Anticompetitive conduct can create an inference of specific intent to monopolize. *Id.* at 507, 723 F.2d 495. In determining whether an antitrust defendant has a dangerous probability of success in monopolizing a particular market, a court looks to whether the defendant has market power approaching that of monopoly power in the relevant market. *Tarrant Serv. Agency v. Am. Standard, Inc.*, 12 F.3d 609, 615 (6th Cir.1993); *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 917 F.2d 1413, 1433 (6th Cir.1990). The market power must be relatively close to a level of monopoly power, which is the ability to control prices and exclude competition. *Tarrant Servs.*, 12 F.3d at 615.

Plaintiff moves the Court for summary judgment on Defendant's attempted monopolization claims on the grounds that Defendant has not submitted any proof of the relevant market nor sufficient market power within the relevant market to meet the third prong of the test. Defendant argues that the relevant market could not be any broader than the U.S. market for cottonseed and soybeans and then argues that Plaintiff has 67% of the U.S. soybean market. However, the proof demonstrates that rather than having 67% of the U.S. soybean market, 67% of the acres planted in the year 2000 were planted with soybeans containing Plaintiff's patented tech-

nology. (Adams Dep. at 62.) Plaintiff, though, only had 20–30% of the U.S. soybean seed market and 0% of the U.S. cottonseed market in 2000. (Adams Dep. at 138–39; Rhylander Dep. at 336–37.) All of the cotton acres planted with Plaintiff's gene technology were planted with cottonseed purchased from companies who obtained licenses to use the technology in developing their own cottonseed. With regard to soybeans, 70–80% of the soybeans sold in the U.S. are sold by Plaintiff's competitors, some of whom used technology licensed from Plaintiff. As the Sixth Circuit noted in *Langenderfer*, market shares of 30% were found to be insufficient as a matter of law to support a claim that an antitrust defendant had a dangerous probability of success of monopolizing a particular market. 917 F.2d at 1432. As such, Defendant cannot meet his burden on the third prong of the attempted monopolization test.

Furthermore, Defendant has offered nothing other than the licensing agreements as the anticompetitive conduct to meet the second prong of the test and to create an inference of specific intent to monopolize to meet the first prong of the test. The Court has already held that the licensing agreements with the seed producers and the farmers are legal restrictions on use pursuant to the patent grant. (Order Granting In Part and Denying In Part Plaintiff's Mot. To Dismiss Def.'s Am. Countercl. at 13–14.) Only Defendant's allegations that the licensing agreements actually contained provisions restricting the licensee's ability to deal in products outside the patent grant survived Plaintiff's motion to dismiss on Defendant's attempted monopolization claims. (Order Granting In Part and Denying In Part Plaintiff's Mot. To Dismiss Def.'s Am. Countercl. at 14.) Defendant has failed to put forward any proof that the licensing agreements restrict the licensee's ability to

deal in products outside the scope of the patent grants. Therefore, because Defendant has offered no proof in support of his attempted monopolization claims, the Court GRANTS Plaintiff's motion for summary judgment and DISMISSES Defendant's attempted monopolization counterclaim.

### 3. Conspiracy to Monopolize

■ Plaintiff also moves the Court for summary judgment on Defendant's counterclaim of conspiracy to monopolize. Defendant's conspiracy to monopolize claim must fail because Defendant has put forward no proof of any conspiracy whatsoever nor any proof of a specific intent to monopolize as is required to prove a § 2 claim. *Bailey's, Inc. v. Windsor Am., Inc.,* 948 F.2d 1018, 1032 (6th Cir.1991); *Richter Concrete Corp. v. Hilltop Concrete Corp.,* 691 F.2d 818, 827 (6th Cir.1982). Again, the only proof of a conspiracy is Plaintiff's conditioning the use of its patented technology on license agreements signed by seed producers and farmers. Rather than providing proof of a conspiracy to monopolize, this licensing agreement allows seed producers other than Plaintiff to use the technology in the development of cottonseed and soybeans in varieties of plants that they are already growing and selling in competition with each other and Plaintiff. Accordingly, the Court GRANTS Plaintiff's motion for summary judgment and DISMISSES Defendant's conspiracy to monopolize counterclaim.

### 4. Unreasonable restraint of trade

■ Plaintiff moves the Court for summary judgment on Defendant's claim of unreasonable restraint of trade. A claim of unreasonable restraint of trade is a claim made under Section 1 of the Sherman Act, 15 U.S.C. § 1, and is "a determination involv[ing] a complex, time-consuming, costly inquiry into the purposes of the restraint and its likely effect on competi-

tion in the market in question." *Balmoral Cinema, Inc. v. Allied Artists Pictures Corp.,* 885 F.2d 313, 315 (6th Cir.1989). This inquiry is generally called a rule of reason analysis, but some actions are so clearly restraining of trade that they are per se violations of the Sherman Act. *Id.* Concerted actions to set prices, for example, are per se violations while concerted actions on non-price restrictions are evaluated under the rule of reason analysis. *Monsanto v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). As the Supreme Court has held,

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

*Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49 n.15, 97 S.Ct. 2549, 53 L.Ed.2d 568 (quoting *Chicago Bd. of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918)).

■ In the present case, Defendant argues that the licensing agreements between Plaintiff and seed producers, which require farmers purchasing seed grown with Plaintiff's technology to sign the li-

censing agreements prohibiting the farmer from saving seed, are unreasonable restraints of trade in violation of 15 U.S.C. § 1. However, the Court has already held that these restrictions on use and reuse are legal restrictions on the use of patented technology. (Order Granting In Part And Denying In Part Pl.'s Mot. To Dismiss Def.'s Am. Countercl. at 13–14.) Defendant's counterclaims only survived Plaintiff's motion to dismiss because Defendant pled that the license agreements restricted the licensee's ability to deal in products outside the scope of the patent grant. (Order Granting In Part and Denying In Part Plaintiff's Mot. To Dismiss Def.'s Am. Countercl. at 14, 18.) The only proof offered in this case on issue of market share shows that the licensing agreements have not restricted competition of seed producers and retailers. (Rhylander Dep. at 138–40.) Defendant has failed to come forward with any proof of anticompetitive behavior of Plaintiff outside the scope of its patent grant or any anticompetitive use of its patents that violates the Sherman Act. Rather, Defendant merely repeats the same refrain that prohibiting farmers from saving seed in the licensing agreement is anticompetitive and violative of the Sherman Act.[5] Such arguments, without legal support, cannot support a

claim for unreasonable restraint of trade. Accordingly, the Court GRANTS Plaintiff's motion for summary judgment on this point and DISMISSES Defendant's counterclaim for unreasonable restraint of trade.[6]

## C. Plaintiff's Claims of Patent Infringement

Plaintiff also moves the Court for summary judgment on its claims of patent infringement. A claim for patent infringement under 35 U.S.C. § 271(a) (1994) comprises two steps: (1) construing the patent, which is a matter of law for the Court, and (2) determining whether the patent was infringed, a question of fact for the trier of fact. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 385, 391, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Patent infringement occurs when someone "without authority makes, uses, offers to sell, or sells any patented invention, within the United States ...." 35 U.S.C. § 271(a) (1994). Patents are presumed valid and the burden is on the party claiming invalidity to show that the patent is invalid. 35 U.S.C. § 282 (1994).

In the present case, Defendant proffers a number of arguments to show that the '605 patent is invalid or that the seed

---

5. Defendant also repeatedly makes the argument that Plaintiff has engaged in anticompetitive conduct that hurts American farmers by selling its Roundup Ready® soybeans in Argentina at lower prices and without requiring the farmers to sign restrictive licensing agreements. However, the support Defendant relies on for this proposition also provides the reason for the different business model, which is that Plaintiff, due to changes in the Argentine patent law, was unable to secure a patent on the Roundup Ready® technology in soybeans in Argentina and, therefore, must sell it like conventional soybeans on the open market. (GAO Rep. to the Comm. on Agric., U.S. House of Reps., Def.'s Resp. Ex. 7 at 5 (We identified two primary reasons for the price differences: (1) greater

control over patented seed technology in the United States and (2) extensive black market sales of soybean seeds in Argentina. Roundup Ready soybean seeds are patented in the United States; they are not patented in Argentina).) Requiring license terms in countries where Plaintiff has a patent while not requiring the same terms where Plaintiff does not have a patent is not anticompetitive behavior.

6. Because the Court has granted summary judgment to Plaintiff on all of Defendant's antitrust counterclaims, the Court need not address the issue of antitrust standing since regardless of whether Defendant has standing to raise his antitrust claims, they fail as a matter of law.

used by Defendant containing the patented gene is outside the patent grant. As an initial matter, the Court notes that Defendant expressly waived any arguments of invalidity through claim construction at the status conference held on November 9, 2000. The Court entered an Order on November 14, 2000, which states "[d]uring the conference, Defendant informed the Court that there are no issues under *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), and that no technical briefing is required in this case." (Order Following Status Conference, Nov. 14, 2000.) As such Defendant is estopped from now claiming patent invalidity or that the gene technology present in the seeds used by Plaintiff in the 1999 and 2000 growing seasons was outside the scope of the patent. As such, the patent is presumed valid under the law and the only question remaining is whether Defendant infringed on the patent.

### 1. Claim Construction

Even assuming that Defendant did not waive a challenge to the validity of the patent, Defendant's arguments that the patent is invalid or that the seeds planted by Defendant were outside the scope of the patent grant are without merit. The '605 patent, in claims 1 and 4, covers a chimeric gene, i.e., a gene comprised of elements that do not occur together in nature, that is expressed in plant cells comprising a promoter element and a structural sequence that is heterologous to the promoter. Claims 1 and 4 specifically claim a gene in which the promoter is selected from the group consisting of CaMV (35S) and CaMV (19S) promoters isolated from CaMV protein-encoding DNA sequences. Claims 1 and 4 also cover a structural sequence of a gene that is heterologous to the promoter. Claim 1 covers the gene itself, and Claim 4 covers a plant cell which comprises the gene.

Bollgard® Cotton and Bollgard® with Roundup Ready® Cotton contain the proprietary DNA that causes the gene to create the *Bt* CRY1A(c) protein, which repels insect pests. The CaMV promoter and an enhancer are contained in the transcription initiation region of the DNA. The promoter starts the process of protein production and the enhancer amplifies and enhances the activity of the promoter. In order for the production of the protein to occur, the cell containing the patented gene transcribes the nucleotide coding sequence into mRNA and then attaches a string of A nucleotides called a polyA tail to the end of the mRNA. The polyA tail allows the mRNA to be transported from the nucleus of the cell into the cytoplasm of the cell, where it is translated in the *Bt* CRY1A(c) protein. The transcription region used in Bollgard® Cotton uses the 35S CaMV promoters, which has been shown effective in causing the required cellular processes that result in high production levels of the protein. As such, the Bollgard® Cotton gene is covered by claims 1 and 4 of the '605 patent.

The Roundup Ready® gene consists of similar components as the Bollgard Cotton gene. The Roundup Ready® gene uses a recombinant-stranded DNA molecule that consists of a CaMV35S promoter, a chloroplast transit peptide coding sequence, a CP4EPSPS coding sequence, and a NOS3 non-translated region. The DNA molecule in the Roundup Ready® soybeans causes the plant cells to produce the CP4EPSPS enzyme that renders the cells resistant to the Roundup herbicide. The gene operates in a similar fashion to the Bollgard® gene, but produces the CP4EPSPS enzyme rather than the *Bt* CRY1A(c) protein. As such, the Roundup Ready® gene is also covered by claims 1 and 4 of the '605 patent.

## 2. Patent Infringement

■ On August 18, 2000, the Court entered an Order granting Plaintiff's motion for expedited discovery, which allowed Plaintiff to enter Defendant's land and collect samples of his crops for testing. Plaintiff did so on August 29, 2000, and collected samples from Defendant's cotton fields and soybean fields. The samples were collected by employees of ABG and transferred for testing to Denise Breimeir at Biolab Solutions. At Biolab, Ms. Breimeir subjected 75 samples of Defendant's cotton plant leaves to assay by enzyme link immunosorbent assay ("ELISA") to detect the presence of CRY1A(c) protein produced by Bollgard® Cotton. The ELISA testing showed that 93% of the cotton samples produced the CRY1A(c) protein. Dr. Pang then tested 17 cottonseeds from bolls of cotton taken from Defendant's land by extracting the DNA from the seeds and using a polymerase chain reaction method ("PCR") to determine whether the transgene insertion region for the Bollgard® gene was present in the cottonseeds. In addition, the seeds were assayed for the presence of tandemly duplicated CaMV35S enhancer sequence. Finally, the PCR products from the PCR testing were subjected to restriction endonuclease analysis which demonstrated that the CaMV35S enhancer sequence that expresses the CRY1A(c) protein was present in the seeds. The sum of the testing revealed that the patented chimeric gene, as described in claims 1 and 4 of the '605 patent, was present in at least 93% of the samples taken from Defendant's cotton fields.

The same tests were performed on the samples from Defendant's soybean fields, including the PCR test, the DNA sequencing test, and the ELISA test to determine whether the gene construct and the CP4EPSPS enzyme was present in the soybean samples. The results of the testing demonstrated that the gene construct covered under claims 1 and 4 of the '605 patent were in 100% of the 28 samples collected from 11 of Defendant's fields.

The only conclusion to be drawn from the results of the testing is that Defendant was clearly using Plaintiff's patented technology in his cotton and soybean crops for the 2000 season. The evidence also demonstrates that in the 2000 growing season, Defendant was not authorized by Plaintiff to use this patented technology since Defendant never signed a licensing agreement with Plaintiff for the use of Bollgard® with Roundup Ready® Cottonseed or the use of Roundup Ready® Soybeans. Defendant states in his affidavit in support of his response to Plaintiff's motion for summary judgment that he never signed a licensing agreement. (Trantham Aff. at 1.) Therefore, Defendant infringed on Plaintiff's patent by using its patented technology without authorization.

## 3. Defendant's Defenses

Defendant has raised a number of defenses against Plaintiff's patent infringement claims. The Court will address each one of the defenses.

### A. The Scope of the Patent

■ Defendant's first argument is that Plaintiff's utility patent applies only to the first generation of the plants with the patented gene in them. Defendant argues that the passage of the Plant Patent Act ("PPA"), codified at 35 U.S.C. § 161, implicitly modifies the utility patent act, codified at 35 U.S.C. § 101. Under the PPA, a plant patent may be granted to "[w]hoever invents or discovers and asexually reproduces any distinct and new variety of plant, including cultivated sports, mutants, hybrids, and newly found seedlings, other than a tuberpropogated plant or a plant found in an uncultivated state ...." 35 U.S.C. § 161. Defendant argues that once

patented plants reproduce sexually, the resulting offspring plant, while retaining characteristics of the parent plant, is nevertheless a separate plant that is the product of nature and is outside the coverage of the PPA. Unfortunately for Defendant, his argument offers him no defense to Plaintiff's patent infringement claims.

As an initial matter, Defendant waived the claim construction aspect of this case in November 2000. As such, the argument that the '605 patent is actually the patent for a plant and not a gene construct and a plant cell containing the gene construct is no longer before the Court. Furthermore, the '605 patent is not for a new plant variety, which is what the PPA covers, but is rather for a gene that can be inserted into any plant variety making it resistant to the Roundup herbicide. Plaintiff has never argued that it patented a plant. Rather, Plaintiff seeks enforcement of the patent over the gene technology that is found within the plants grown on Defendant's land. As such, the applicable provision of the patent law is § 101, not § 161, and, therefore, the asexual reproduction provisions do not apply.

Defendant misconstrues the relationship between basic patent law and the PPA. Section 161 states, "[t]he provisions of this title relating to patents for inventions shall apply to patents for plants, except as otherwise provided." 35 U.S.C. § 161 (1994). Therefore, the provisions of the utility patent law apply to patents for plants unless the PPA has a specific provision to the contrary. The relationship is not one in which the PPA modifies the patent law whenever a plant is involved, but rather that the basic patent law applies to patented, new varieties of plants except where the PPA has provisions different from basic patent law. Since the '605 patent is for a gene and not for a new variety of plant, the PPA never comes into play in this analysis and Defendant's reliance on *Ima-* *zio Nursery, Inc. v. Dania Greenhouses,* 69 F.3d 1560 (Fed.Cir.1995), is unavailing.

Finally, Defendant's argument that the testing submitted by Plaintiff is insufficient to demonstrate literal infringement is without merit. The testing demonstrated not only the production of a protein and an enzyme that are not naturally occurring phenomena but also the presence of the particular patented gene in the plant cells taken from Defendant's land. If there could be a more certain method of determining Defendant's use of Plaintiff's patented technology, it is outside the conceptualization of this Court and certainly has not been presented by Defendant. Defendant was clearly using Plaintiff's patented technology in his farming operation without authorization from Plaintiff. Therefore, he was infringing on Plaintiff's patent.

## B. Patent Exhaustion and First Sale

 Defendant argues that Plaintiff's claims of patent infringement are barred by the doctrines of patent exhaustion and first sale. As a general rule, the sale of a patented device exhausts the patentee's control over the use of that device and no restriction can be placed by the patentee on the buyer's use of that device. *B. Braun Med., Inc. v. Abbott Labs.,* 124 F.3d 1419, 1426 (Fed.Cir.1997). As the Court of Appeals for the Federal Circuit has held, "[t]he theory behind this rule is that in such a transaction, the patentee has bargained for, and received, an amount equal to the full value of the goods." *Id.* However, the Federal Circuit, summarizing Supreme Court caselaw, has also held that

This exhaustion doctrine, however, does not apply to an expressly conditional sale or license. In such a transaction, it is more reasonable to infer that the parties negotiated a price that reflects only the value of the "use" rights conferred

by the patentee. As a result, express conditions accompanying the sale or license of a patented product are generally upheld. *See Mallinckrodt*, 976 F.2d [700, ]708, 24 U.S.P.Q.2d at 1177, 1179; *cf. General Talking Pictures Corp. v. Western Elec. Co.*, 305 U.S. 124, 127, 59 S.Ct. 116, 117, 83 L.Ed. 81 (1938) ("That a restrictive license is legal seems clear.").

*Id.* Licensing agreements limiting the right of the purchaser to a single use of the patented product have been held to be legal under the patent law. *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 708–09 (Fed.Cir.1992). As the Court has already held this licensing agreement to be within the scope of the patent grant, the doctrine of exhaustion does not bar this suit for infringement since the sale of Plaintiff's patented gene technology is expressly conditioned on the signing of the restrictive licensing agreement that prohibits the saving of seed and restricts the use of the seed to a single growing season. Accordingly, Defendant's argument of patent exhaustion does not operate to bar Plaintiff's claims for patent infringement.

### C. Implied License

■ Defendant also argues that Plaintiff granted Defendant an implied license to use its product when the retailer who sold Defendant seeds with Plaintiff's patented technology signed the licensing agreement for Defendant. In a patent infringement case, the burden of proving the grant of an implied license falls on the party asserting the license, in this case Defendant. The question of whether an implied license has been granted is a question of law for the Court, *Glass Equip. Dev. Inc. v. Besten, Inc.*, 174 F.3d 1337, 1341 (Fed.Cir.1999), and involves a two-part test by which Defendant must show (1) that there were no other non-infringing uses of the patented material and (2) that the circumstances of the sale plainly indi-

cate that the grant of an implied license should be inferred, *Met–Coil Sys. Corp. v. Korners Unltd., Inc.*, 803 F.2d 684, 686–87 (Fed.Cir.1986) (citing *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 924–25 (Fed.Cir.1984)). While there do not appear to be any non-infringing uses, since the only use of the seed was to be planted for crops, the circumstances of the sale do not indicate that the grant of an implied license should be inferred. First, Defendant admits that the retailer told him specifically that a license had to be signed before the seed could be sold. (Trantham Aff. at 1.) Second, the bags Plaintiff purchased stated specifically that

> These seeds are covered under U.S. Patents 4,535,060, 4,940,835 and 5,352,605. The purchase of these seeds conveys *no license* under said patents to use these seeds. A license must first be obtained from Monsanto Company before these seeds can be used in any way.

(Pl.'s Mot. For Summ. Judg., Statement of Uncontested Facts ¶ 4.) Therefore, even if the retailer signed the licensing agreement for Defendant, Defendant was on notice at the time of the sale that in order to avoid infringing on Plaintiff's patents, he had to obtain a license from Plaintiff prior to any use. Under these circumstances, no grant of implied license should be inferred and the Court HOLDS that none was granted to Defendant for use of these seeds. Accordingly, Plaintiff's patent infringement claims are not barred by the doctrine of implied license.

### D. Unclean Hands

■ Defendant also argues that Plaintiff's claims are barred by the doctrine of unclean hands. Defendant argues that actions for patent infringement are actions in equity and, therefore, Plaintiff's claims are barred because the retailer forged Defendant's signature on the licensing agree-

ment when the seeds were sold.[7] The doctrine of unclean hands operates to deny equitable relief to a party who is "guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party." *Performance Unltd., Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1383 (6th Cir.1995) (quoting *Novus Franchising, Inc. v. Taylor*, 795 F.Supp. 122, 126 (M.D.Pa.1992)). The alleged misconduct by the plaintiff against whom the doctrine of unclean hands is asserted must relate directly to the transaction about which the plaintiff is complaining. *Id.* at 1383.

Defendant relies on the Supreme Court's decision in *Precision Instrument Manufacturing Company v. Automotive Maintenance Machinery Company*, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945), for the proposition that a case for patent infringement can be barred when the patent holder acts with sufficient fraud and deceit in the prosecution of its claim. The Supreme Court held that Precision Instrument Manufacturing had procured patents without disclosing to the Patent Office that the claims were based on falsehoods and frauds made by the person claiming to have invented the torque wrenches at issue. *Id.* at 816, 65 S.Ct. 993. Since Precision did not disclose the fraud to the patent office, the doctrine of unclean hands operated to prevent Precision from suing for enforcement of the patents and the settlement contracts that provided the basis for the patent grant. *Id.* at 881–19, 65 S.Ct. 993.

In the present case, Defendant argues that the doctrine of unclean hands should bar Plaintiff's patent infringement claims because the retailer who sold Defendant seeds containing Plaintiff's patented technology allegedly forged Defendant's signature on the licensing agreement. Defendant argues that Plaintiff has admitted that retailers who sell its technology are Plaintiff's agents, and therefore, Defendant should not be held liable for infringement when Plaintiff's agent signed the licensing agreement for Defendant. However, under the caselaw submitted by Defendant the doctrine of unclean hands would only operate to bar Plaintiff's suit if Plaintiff were seeking to enforce the licensing agreement. Plaintiff is not seeking to enforce that agreement. Rather Plaintiff is suing Defendant for patent infringement and for a reasonable royalty on the patented technology used by Defendant. Both Plaintiff and Defendant agree in this case that there was no valid grant of a license agreement to use Plaintiff's patented technology. Unfortunately for Defendant, without a valid licensing agreement, his use of Bollgard® and Roundup Ready® seeds constituted patent infringement, especially in light of the fact that he was on actual notice of the requirement to obtain a license in that he was told by the retailer that a licensing agreement was required to use the technology and the bags of Roundup Ready® soybeans carry the same message. The question of whether the retailer who sold the seeds to Defendant in 1999 was an agent of Plaintiff, under the legal definition of that term, is, therefore, irrelevant to the patent infringement case before the Court. Defendant never obtained a license to use Plaintiff's patented technolo-

---

**7.** Defendant's argument that Plaintiff's claims are equitable claims is inaccurate. The Supreme Court held, in *Markman v. Westview Instruments, Inc.,* that patent infringement claims are statutory actions that descended from patent infringement cases tried at com-

mon law prior to the merger of the courts of law and equity. 517 U.S. 370, 376, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). As such, patent infringement cases are cases at law even though equitable relief is available.

gy and is liable to Plaintiff for the infringement of that technology.

### D. Other Issues

Finally, Defendant repeats his request for a stay of these proceedings until the Supreme Court decides the case *Pioneer Hi–Bred Int'l, Inc. v. JEM Ag. Supply,* 200 F.3d 1374 (Fed.Cir.2000), *cert. granted* —— U.S. ——, 121 S.Ct. 1077, 148 L.Ed.2d 954 (2001). The Court denied this request on April 4, 2001, on the grounds that *Pioneer* will not likely be decided until some time in 2002, a time too remote to stay these proceedings. The Court sees no reason to reconsider that decision at this time and DENIES Defendant's request for a stay of proceedings.

### IV. Conclusion

For the foregoing reasons, the Court DENIES Defendant's Motion To Substitute David W. Parvin, Jr., As An Expert In Lieu Of Leroy Davis, and GRANTS Plaintiff's Motion For Summary Judgment in its entirety. The only remaining issue in this case is the issue of damages owed by Defendant to Plaintiff for the infringement of Plaintiff's patents. The trial on damages will take place at *9:30 a.m. on Tuesday, September 25, 2001.* The pretrial order and conference dates remain those set in the Court's Order of July 9, 2001.