**In re James Edward WOOD, Debtor.**

**Monsanto Company, Plaintiff,**

v.

**James Edward Wood, Defendant.**

**Bankruptcy No. 02–25981–WHB.
Adversary No. 02–0597.**

United States Bankruptcy Court,
W.D. Tennessee,
Western Division.

April 14, 2004.

Miles P. Clements, Joseph N. Mole, Michael H. Pinkerton, New Orleans, LA, Jack Marlow, Memphis, TN, for Monsanto Company.

P. Preston Wilson, Virginia Beach, VA, for James Edward Wood.

**MEMORANDUM OPINION ON COM-PLAINT TO DETERMINE DIS-CHARGEABILITY**

WILLIAM H. BROWN, Bankruptcy Judge.

Plaintiff Monsanto Company ("Monsanto") commenced this adversary proceeding seeking a nondischargeable judgment against Mr. Wood ("Debtor") for his infringement of Monsanto's patent based upon the "willful and malicious" exception to discharge set forth in § 523(a)(6) of the Bankruptcy Code. Monsanto also seeks a permanent injunction against future in-

fringement. The Debtor contends that the infringement was inadvertent and therefore the Debtor lacked the intent necessary to establish that his actions meet the willful and malicious requirements for non-dischargeability. The Debtor also disputes the amount of damages claimed by Monsanto.

The trial of this proceeding took place on August 18 and 19, 2003, and since that time the parties have submitted post-trial briefs. The Court held this matter in abeyance pending the decision by the Bankruptcy Appellate Panel in *Monsanto Co. v. Trantham (In re Trantham)*, 304 B.R. 298 (6th Cir. BAP 2004), which is a similar proceeding to the one in this case. Upon consideration of the evidence and testimony presented at trial, the statements of counsel, the parties' memoranda, and the entire record in this cause, including the District Court's summary judgment opinion, the Court finds and concludes that the damages incurred by Monsanto, as determined by this Court and as will be discussed in this opinion, as a result of the Debtor's patent infringement constitute a nondischargeable debt under the willful and malicious exception to discharge set forth in § 523(a)(6) of the Bankruptcy Code.

This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(A) and (b)(2)(I). The following constitutes the Court's findings of fact and conclusions of law pursuant to FED. R. BANKR.P. 7052.

## SUMMARY OF FACTUAL FINDINGS

It is important to note that the United States District Court had a suit pending between these parties prior to the Debtor's bankruptcy filing, and the automatic stay was lifted to permit the District Court to enter its summary judgment opinion. That opinion is a part of the record in this adversary proceeding as docket entry 25,

and, of course, this Court is bound by the factual findings made in that opinion. As a part of that opinion, the District Court quoted from findings made in a companion suit in that Court, *Monsanto Co. v. Trantham*, 156 F.Supp.2d 855 (W.D.Tenn.2001):

This case stems from [Monsanto's] patents on technology that allows a seed producer of cottonseed and soybean seeds to insert genes into the seed to make the resulting plants resistant to glysophate herbicides, such as Roundup herbicide, a product manufactured by [Monsanto]. Seeds with the patented technology are called Roundup Ready®. A grower using the Roundup Ready® seed can spray his crops with the Roundup herbicide, or another glysophate herbicide, thereby killing the weeds in his field without damaging his crops. The technology can also be injected into cottonseed to make the resulting cotton plants insect repellant. Cottonseed using the technology is called Bollgard® Cotton. Cottonseed containing both versions of the technology is called Bollgard® with Roundup Ready® Cotton. [Monsanto's] Roundup Ready® and Bollgard® gene technology is protected by three patents, which were issued prior to the events giving rise to this controversy. Plaintiff sells the gene technology to seed producers under a license to use the technology in the production of cottonseed and soybeans. The seed producers then sell the seed treated with the technology to retailers or to growers, both of whom must obtain licenses from [Monsanto] before selling or using the seeds with the Roundup Ready® or Bollgard® technology. The license agreement does not require the seed producers or retailers to sell the seed developed with the Monsanto technology at any specific price nor does the license restrict the grower or the retail-

er from selling conventional types of seed.

In order for an individual farmer to use seed produced with the patented gene technology, the farmer must be licensed to use the product. Under the licensing arrangement, a grower is only allowed to use the technology in one growing season and is prohibited from saving for later planting any of the seed produced from plants grown using the purchased seed. The grower is also prohibited from selling saved seed or transferring the seed to anyone else for planting.

*Id.* at 858–59 (footnotes omitted), as quoted in the District Ct.Summ. J. Op., docket entry 25, pages 3–4.

This finding of Monsanto's technology and the licensing that is required for use of its patented seed is consistent with the proof heard in the trial in this Court. Moreover, there was proof that the terms of the licensing agreement provide that the grower must follow requirements for insect resistance monitoring, a term of its technology agreement necessary to assist Monsanto in meeting the insect resistance monitoring requirements imposed upon it by the Environmental Protection Agency for its Bollgard® products.

Monsanto produced proof that farmers were fully aware, during the relevant time period involved in this litigation, that saving and replanting its patented seed is prohibited. When the technology was introduced to the public, Monsanto sponsored informational meetings for prospective purchasers and explained the terms of permissible use. In addition, Monsanto sent direct mailings to growers, including the Debtor, explaining the technology and the conditions for its use. In compliance with patent law, Monsanto marks all seed bags containing Roundup Ready® soybean seed and Bollgard® with Roundup Ready® cottonseed with notice that the seed is protected by patents. In the District Court's opinion, the following finding was made, again consistent with proof heard in this Court:

Additionally, in compliance with 35 U.S.C. § 287, all seed bags containing Roundup Ready® soybean seed and Bollgard® with Roundup Ready® cottonseed are marked with the '605 patent number under which the seeds are protected. Printed on all bags of Roundup Ready® soybean seed marketed for sale is the following: "A LICENSE MUST BE OBTAINED FROM MONSANTO BEFORE THESE SEEDS CAN BE USED IN ANY WAY." A similar message is printed on bags of Bollgard® with Roundup Ready® cottonseed marketed for sale: "IT IS A VIOLATION OF FEDERAL PATENT LAW TO USE THIS SEED FOR ANY PURPOSE WITHOUT OBTAINING A LICENSE FROM MONSANTO CO."

District Ct. Summ. J. Op., docket entry 25, page 5. There was no proof that this Debtor actually signed a licensing agreement, and no signed agreement was produced at trial; however, the Debtor admitted that he was aware that the seed purchased by him in two planting years was subject to the patents. In the absence of an executed agreement between the parties, there is no viable breach of contract claim; however, there are still valid patent infringement claims. The Debtor does not defend this action on the basis that he was unaware of restrictions against saving patented seed; rather, he defends on the basis that any saving was a mistake.

In the 1999 growing season, the Debtor, a farmer in Tipton County, Tennessee, purchased 24 bags of Bollgard® with Roundup Ready® cottonseed from a local dealer and he planted that seed on his farm designated by the Farm Service

Agency as Farm No. 1915, also known as the Lackey Farm. The Debtor also planted conventional, non-genetically altered cotton on Farm No. 1919. Although no evidence was introduced that the Debtor signed a licensing or technology agreement upon purchasing the Monsanto seed, invoices from the retailer indicate that the Debtor paid the required technology fee, Exhibits 1 & 2, and the Debtor does not deny that, at the time of planting the patented seed on Farm No. 1915 in 1999, he was aware that the seed extracted from the resulting cotton on that farm could not be saved and replanted under the terms of Monsanto's technology agreement.

The Debtor testified in this Court that at all times he intended to save seed only from the conventional cotton planted and harvested from Farm No. 1919, and that he never intended to save seed from his Bollgard® with Roundup Ready® cotton. Of course, the fatal flaw to this contention is that the District Court found otherwise:

> After harvesting the 1999 cotton crop, Wood and William Trantham decided to save a portion of the seed ginned from the crop. In accordance with Wood's instructions, the Charleston Gin saved cottonseed ginned from three modules of cotton harvested from Farm No. 1915. The saved cottonseed was sent to Sinkers, Inc., a seed cleaning and conditioning company, for delinting and chemical treatment. Sinkers returned 725 bags of cottonseed to [Wood], who transferred a portion to Trantham for planting.

*Id.,* at pages 5–6 (footnote omitted).

Not only is this Court bound by that finding, it is consistent with the persuasive proof presented to this Court. Notwithstanding the Debtor's contention that he told a representative of the Charleston Gin that he wanted to save the seed from the conventional cotton harvested from Farm No. 1919, the compelling proof, by a preponderance of the evidence, does not support his position. A receipt from the Gin dated October 16 indicates that cotton was received from Farm No. 1919, but it also labels Farm No. 1919 as the Lackey Farm. Ms. Glass, who acts as secretary for the Gin, testified that the identifying farm information is given to her by the person who delivers the cotton, in this case either the Debtor or his representative. Other Gin receipts dated October 30 and 31 simply name the Lackey Farm as the source of the cotton delivered, without assigning the farm number. None of these receipts indicate that the Gin was instructed to save seed from the cotton delivered on those days.

Subsequent to the October deliveries to the Gin, Gin receipts indicate that two additional deliveries were made on November 6. One of the receipts indicates that the cotton was from Farm 1915, which is further correctly identified as "Lackey," and the other receipt from that day simply states that the cotton was from Farm No. 1915. Thus, the cotton delivered that day was produced from Monsanto's Bollgard® with Roundup Ready® cottonseed. Both receipts indicate that seed was saved from these two loads, which constituted a violation of Monsanto's technology agreement and infringement of its patent. Ms. Glass testified that seed is saved only upon the request of the grower[1], and in this case, the instructions were transmitted to her through another Gin employee, presumably upon the request of the Debtor. The Debtor was given copies of the November 6 receipts, but he never suggested to Gin employees that the wrong seed was saved.

---

1. There was testimony about the time and difficulty involved in cleaning the Gin prior to saving seed, a process necessary in order to prevent co-mingling of different types of seed.

Most compelling was the testimony of the Gin manager, Mr. Means, who stated that Mr. Woods told him to save seed from the Lackey farm in 1999. He also testified that it was common knowledge in 1999 that one could not save seed from a Monsanto patented crop, and, of course, Mr. Means was not told that the seed he was instructed to save was Monsanto seed.

As stated by the District Court, before planting seed saved from a cotton crop it is necessary to have the seed delinted and properly prepared. This Court also finds, consistent with the District Court's finding, that the Debtor and another farmer, Mr. Trantham[2], decided to send their saved seed to a facility known as Sinkers for delinting and treatment in preparation for planting the saved seed in the 2000 growing season. The Debtor and Mr. Trantham transacted their business with Sinkers, including executing all documentation, using and signing the alias name "Jack Tyus."[3] In order to pay Sinkers for its services, the Debtor purchased a bank money order under the name Jack Tyus, and signed Mr. Tyus's name as payor. Monsanto alleges that use of the alias was to conceal the Debtor's infringement of its patent. The Debtor testified that use of the alias was for the benefit of Mr. Trantham, who had previously been involved in a lawsuit with Sinkers. The Debtor admitted, however, that he had credibility with Sinkers and that the transaction could have been made in his own name. The Court finds the Debtor's testimony less than credible, especially in view of Mr. Trantham's admission in this trial that at the time the seed was sent to Sinkers he was aware that they were saving Monsanto's patented seed.[4] The "Tyus" transactions can only logically be explained as a part of the attempt to conceal the saving of Monsanto's protected seed.

From the crop that was harvested from the Bollgard® with Roundup Ready® cottonseed that the Debtor purchased in 1999, Sinkers returned 725 bags of processed cottonseed to the Debtor, who divided the seed with Mr. Trantham, with each getting 362.5 bags. The Debtor then used his portion of the saved Bollgard® with Roundup Ready® cottonseed for planting a portion of his 2000 cotton crop. The District Court found that he planted "approximately 400 of the 700 acres allocated for cotton" during the 2000 growing season. District Ct. Op., docket entry 25, at page 6. "The remainder [of his 2000 cotton crop] was planted with 53 bags of newly purchased Bollgard® with Roundup Ready® cottonseed." *Id.* The District Court also found, consistent with the proof heard by this Court, that "Wood also planted approximately 500 acres of soybean seed during the 2000 growing season. Approximately 150 acres were planted with Roundup Ready® soybean seed, and

---

2. *See Monsanto Co. v. Trantham,* 156 F.Supp.2d 855 (W.D.Tenn.2001); *Monsanto Co. v. Trantham (In re Trantham),* 286 B.R. 650 (Bankr.W.D.Tenn.2002), *rev'd.* 304 B.R. 298 (6th Cir. BAP 2004) (the BAP holding that Mr. Trantham infringed upon Monsanto's patent by saving and replanting Monsanto's seed and that the resulting judgment is nondischargeable in bankruptcy pursuant to the "willful and malicious" exception to discharge under § 523(a)(6) of the Bankruptcy Code). Mr. Trantham's case and the Bankruptcy Appellate Panel's opinion is discussed in greater detail below.

3. The real Mr. Jack Tyus is apparently an acquaintance of the Debtor and Mr. Trantham, but he had no involvement in and perhaps no knowledge of the transactions with Sinkers.

4. Although Mr. Trantham first denied that they knew they were saving and sending patented seed to Sinkers, he then admitted that he had testified in his trial with Monsanto before the District Court that it was Bollgard® with Roundup Ready® cottonseed.

glyphosate or sulfosate-based herbicides were applied to the 2000 soybean crop. However, there is no indication that Wood made authorized purchases of Roundup Ready® soybean seed during the 2000 growing season and it is unclear where Wood obtained the soybean seed." *Id.*

In support of his contentions that he was unaware that the saved cottonseed was Monsanto's patented seed, the Debtor testified that he treated the saved seed as conventional in 2000, raising it with conventional chemicals and without Roundup herbicide. However, the persuasive and preponderant proof was contrary to the Debtor's testimony. There was proof about the amount of glyphosate chemicals purchased by him in 2000, an amount that is not persuasively consistent with his explanation that he used those chemicals in 2000 to "burn-down" crops.[5] In view of the Court's finding that Mr. Wood lacked credibility in his explanations, Monsanto's proof about the amount of glyphosate chemicals purchased in 2000 was more consistent with Monsanto's theory that the chemicals were used in large part on Roundup Ready® crops.

Monsanto obtained a court order to enter Mr. Wood's fields in 2000 to monitor and test that year's crops, and Monsanto discovered that the Debtor planted the saved seeds in violation of the technology agreement and Monsanto's patents. Although the Debtor attempted to discredit the testing methodology, Monsanto's proof was persuasive. Moreover, this Court is again bound by the District Court's finding that "[t]he presence of Bollgard® and Roundup Ready® technology was detected by Monsanto in all of [the] cotton fields inspected and sampled. Likewise, the presence of Roundup Ready® technology was detected in all of the soybean fields inspected and sampled." *Id.* at pages 6–7.

The District Court also found, presumably for the 2000 relevant year, that "Wood has never acquired a license to use Roundup Ready® soybean seed or Bollgard® with Roundup Ready® cottonseed, or authorized anyone to obtain such a license on his behalf." *Id.* at page 7. That finding is correct as to the saved seed; however, there was proof introduced by Monsanto that the Debtor purchased 40 bags of Bollgard® with Roundup Ready® cottonseed from Helena on May 24, 2000 and that he paid the technology fee for that purchase. Ex. 9. Monsanto does not allege that the use of this properly-purchased cottonseed was unauthorized. The District Court's finding about lack of a license goes to the reality that the Debtor never had a license or permission from Monsanto to save its seed or to otherwise use it in violation of the patents.

The District Court's summary judgment opinion is based upon its findings that Monsanto's patents are valid, that the Debtor's affirmative defenses to patent infringement were not sustainable, and that the Debtor did infringe Monsanto's patents by saving and replanting the Roundup Ready® soybean seed and the Bollgard® with Roundup Ready® cottonseed. The District Court did not rule on the issue of damages, however, nor whether the Debtor's patent infringements were willful and malicious. In light of the Debtor's pending bankruptcy case, and with the consent of the parties, the District Court remanded these issues to this bankruptcy court. Monsanto accordingly commenced an adversary proceeding in the Debtor's bankruptcy case alleging that the Debtor's con-

---

**5.** Burn-down is an accepted use of such chemicals, a use explained both by the Debtor and by Mr. Rylander for Monsanto.

duct and the resulting injury to Monsanto was willful and malicious as those terms are contemplated in the exception to discharge set forth in § 523(a)(6) of the Bankruptcy Code. Thus, Monsanto claims that it should be awarded damages available under patent law, and that the damage award should be excepted from the Debtor's discharge.

The Debtor contends that the saving and replanting of Monsanto's patented seed was inadvertent and that the Debtor lacked the intent necessary to cause a willful and malicious injury sufficient to except any damage award from discharge. As stated previously, the persuasive proof does not support the Debtor's defense.

## ISSUES

Since the District Court found that the Debtor had infringed Monsanto's patents and that the Debtor never possessed a license to use the saved and patented seed, the issues before this Court are:

A.  Whether the Debtor's infringement of Monsanto's patent rights constitutes a "willful and malicious injury" so as to render any damage award nondischargeable under § 523(a)(6), and

B.  What is the appropriate measure of damages under the facts and circumstances existing in this proceeding?

## DISCUSSION

Although in the face of the District Court's summary judgment and the proof presented in this Court, it is easy to find an infringement of Monsanto's patent, it is a much closer and more difficult determination as to whether that infringement was a willful and malicious injury.

## A.  Willful and malicious injury under § 523(a)(6)

■  Section 523(a)(6) of the Bankruptcy Code excepts from the Debtor's dis-

charge debts incurred "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). Congress defined "willful" as "deliberate or intentional," H.R. 595, 95th Cong. (1st Sess.1977), but the legislative history to § 523(a)(6) does not define the term "malicious," and courts had been divided on how the term should be defined until the Supreme Court defined "willful and malicious injury" in *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). There, the Court determined that such a finding requires "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." 523 U.S. at 61, 118 S.Ct. 974. Even after the Supreme Court's holding, courts continue to have difficulty with the application of the appropriate test to the facts of a particular case. *Compare, e.g.*, the bankruptcy court's and Bankruptcy Appellate Panel's analyses in the *Trantham* opinions, cited in footnote 2. The Sixth Circuit's interpretation of the *Geiger* opinion appears in *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455 (6th Cir.1999), holding that "unless 'the actor desires to cause consequences of his act, or ... believes that the consequences are substantially certain to result from it,' he has not committed a 'willful and malicious injury' as defined under § 523(a)(6)." *Id.* at 464 (citations omitted). The *Markowitz* Court further stated that "[f]rom the plain language of the statute, the [debt] must be for an injury that is both willful and malicious. The absence of one creates a dischargeable debt." *Id.* at 463.

■  Prior to *Geiger*, the term "malicious" had been defined in this Circuit as "conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent to do harm." *Wheeler v. Laudani*, 783 F.2d 610,

615 (6th Cir.1986) (citations omitted). That definition is not controlling, however, in § 523(a)(6) determinations as a result of *Geiger's* and *Markowitz's* emphasis on the subjective nature of the malicious element. To find that a debtor intended to cause the consequences of his act or believed that the consequences were substantially certain to result from his act, it is necessary to look into the debtor's mind, subjectively.

Based on the same, or substantially similar, facts as those existing in this case, the Bankruptcy Appellate Panel for the Sixth Circuit recently decided Mr. Trantham's appeal from the bankruptcy court's decision in a companion case to the one at bar. *See In re Trantham,* 304 B.R. at 298. The Panel stated that it was applying the test set forth in *Markowitz* for determining whether a willful and malicious injury occurred, and noted: "Where Trantham's stated purpose in willfully infringing Monsanto's patents was not to pay Monsanto for its technology, what else could Trantham believe would be the consequences of his act but that Monsanto would be deprived of money to which it was entitled?" *Id.* at 307. In ultimately finding Monsanto's judgment against Mr. Trantham to be nondischargeable under § 523(a)(6), the Panel went on to reason as follows:

> [T]he Debtor [Mr. Trantham] carried out his plan to appropriate Monsanto's technology without any intention of paying Monsanto for it. In addition, Trantham attempted to conceal his efforts. In effect, Trantham was planning to permanently deprive Monsanto of its property (its license fees) without the semblance of authority (the license

agreement) to use the patent technology.

*Id.* at 308 (citing to *McIntyre v. Kavanaugh,* 242 U.S. 138, 141, 37 S.Ct. 38, 61 L.Ed. 205 (1916)).[6]

A criticism of the BAP's analysis is that it may have engaged in its own fact finding as to Mr. Trantham's subjective intent or knowledge rather than remanding for additional fact finding by the bankruptcy court. *See* Nancy King, *Discharge that Decision: Monsanto Co. v. Trantham,* NORTON BANKR.L. ADVISER (April 2004). In Ms. King's article, she is critical of the BAP's claim to application of *Markowitz's* subjective test, and she asserts that the BAP in fact applied an objective "reasonable person" standard of "what else could Trantham believe" but that the consequences of his act would be to financially harm Monsanto.

The Tenth Circuit recently applied the *Geiger* standard to facts different from the Wood facts, but equally difficult for analysis purposes. *See Panalis v. Moore (In re Moore),* 357 F.3d 1125 (10th Cir.2004). In *Moore,* that court held that the debtor's intent to deceive a judgment plaintiff about insurance coverage was not equivalent to an intent to physically harm that party, and, as a result, the judgment was not excepted from discharge as a willful and malicious injury. That court cited the *Markowitz* holding with approval. *In re Moore,* 357 F.3d at 1129. This Court is persuaded that it can not apply an objective test to determine what Mr. Wood should have known; rather, this Court must determine what Mr. Wood subjec-

---

**6.** Although counsel for the Debtor has made this Court aware that Mr. Trantham has sought reconsideration of the BAP's opinion, and no doubt Mr. Trantham plans to appeal that opinion to the Sixth Circuit, it is unnecessary for this Court to wait longer to enter this opinion. This Court, while giving persuasive effect to the BAP's *Trantham* opinion, does not completely agree with the BAP's method of analysis under the *Geiger/Markowitz* standard, but this Court is persuaded on the facts of Mr. Wood's proceeding that a willful and malicious injury occurred.

tively intended or knew concerning the consequences of his infringement.

Based upon the District Court's summary judgment findings and the proof before this Court, it is easy to determine that Mr. Wood's infringement was willful. He knew that the patented cottonseed, for example, was subject to the restriction against saving/replanting. The Court has found the persuasive and preponderant evidence to be that he knew that he was saving seed from the Lackey farm where the Monsanto cotton crop was harvested. He knew that he was sending Monsanto cottonseed to Sinkers and he did that in a way to conceal the saving. He replanted that saved seed in the next crop year, again in knowing violation of the prohibition. These were willful acts, but were they malicious?

Of course, Mr. Wood did not admit that his actions were either willful or malicious, so we have no direct proof of his subjective intent concerning any harm to Monsanto. In the *Trantham* case, the BAP found it compelling that Mr. Trantham could only have known one consequence—harm to Monsanto by his failure to pay its license or technology fees. In the present proceeding, this Court has heard the proof and from the totality of the proof, this Court finds preponderant evidence that Mr. Wood subjectively knew that the consequences of his unauthorized saving of the cottonseed would be financial harm to Monsanto. Although in this proceeding involving Mr. Wood, there was no direct proof about Mr. Wood's intentions not to pay Monsanto, the evidence establishes that the Debtor, in collusion with Mr. Trantham and in conscious disregard of Monsanto's patent rights, intended to deprive Monsanto of profits from the sale of its patented seed by intentionally saving and replanting Monsanto's Bollgard® with Roundup Ready® cottonseed, and he knew

that such a consequence was substantially certain to result. The proof of the "Tyus" transaction to conceal the unauthorized saving, the Debtor's admission that he saved seed because that was what he "could afford," the admission that he knew that Monsanto's seed was not to be saved, and his transactions with the Charleston Gin demonstrate an awareness that Mr. Wood knew what he was doing, that it was wrong, and that it would harm Monsanto. The Debtor clearly intended to avoid paying Monsanto's price for the seed and the technological license when he saved the patented cottonseed from his 1999 crop and replanted it, in knowing violation of Monsanto's restrictions. Notwithstanding the Debtor's assertions of mistake in saving from the wrong farm, the Court is not persuaded of the Debtor's innocence. Mr. Wood is a farmer of long experience, and he was aware of the patent prohibition against saving seed. The persuasive proof is that he instructed the Charleston Gin to save cottonseed from Farm 1915, and the Debtor, along with Mr. Trantham, conducted the transactions with Sinkers under an assumed name, for no other real purpose than to conceal the saving. The Debtor further admits that he caused a cashier's check to be issued to Sinkers for the delinting services listing "Jack Tyus" as the remitter. In other words, the persuasive proof establishes not what Mr. Wood should have known but what he did know. Mr. Wood's goal of saving himself money by saving cottonseed was undertaken knowing that it would deprive Monsanto of its fees.

■ The Court is certainly not ruling that every patent infringement would be a willful and malicious one, but under the specific facts of this proceeding, the standard set forth in *Markowitz* is satisfied as to the cottonseed. However, the Court is not so persuaded as to the alleged patent

infringement concerning soybean seed. While the District Court found that Mr. Wood planted 150 acres out of 500 in the 2000 crop year with Roundup Ready© soybeans, that Court also said that it was unclear where he acquired those soybeans. Construing the District Court as finding that Mr. Wood's planting of those soybeans was a patent infringement, it is not clear that the planting was a willful and malicious injury. This Court is persuaded that the proof before it and the District Court does not support a conclusion that the soybean infringement was a willful and malicious injury.

First, Mr. Wood had admitted saving cottonseed from his 1999 crop, even though he contended that it was not his intent to save the patented seed. He testified that he did not remember planting any Roundup Ready© soybeans in 1999, but admitted that he saved some seed from his 1999 soybean crop. There was no proof in this trial of his planting or saving Roundup Ready© soybeans in 1999. Even though the District Court found no authorized purchase of Roundup Ready© soybeans in 2000, there simply is no proof upon which this Court can find that Monsanto's detection of Roundup Ready© soybeans in Mr. Wood's 2000 fields establishes a willful and malicious injury. Unlike the proof concerning the cottonseed, there is nothing from which this Court can determine Mr. Wood's subjective intent or knowledge concerning the 2000 soybean crop.

As a result of the absence of such proof, this Court concludes that any damages resulting from patent infringement as to the Roundup Ready© soybeans are not excepted from Mr. Wood's discharge. As a result, it is unnecessary for the Court to analyze monetary damages for any soybean infringement.

## B. Damages

■ An issue still remains as to the appropriate measure of damages to be awarded to Monsanto for the Debtor's willful and malicious infringement of its cottonseed patents. Here, this Court is troubled by Monsanto's proof and what the Court considers to be an overly penal methodology. Monsanto is justifiably aggrieved by patent infringements, but it is not necessary to over-reach in a damage request. Mr. Wood is a farmer with 50 years of farming experience, and it is obvious that he is of an age and financial situation that he is effectively judgment-proof: It is unlikely that a judgment in any amount will be collectible. Monsanto has chased Mr. Wood into bankruptcy, and that in some minds would be punishment enough. These observations are not made to excuse Mr. Wood's actions, but Monsanto's damage proof would have the Court believe that Mr. Wood was intending to go into the seed business. Its damage proof began in the context of a "reasonable royalty for the use made of the invention of the infringer …," 35 U.S.C. § 284, which is the appropriate standard. However, Monsanto then presented proof of a hypothetical negotiation between Monsanto, as if it were a willing licensor, and Wood, as if he were a willing licensee. *See Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1121 (D.C.N.Y. 1970), *aff'd sub nom. Georgia–Pacific Corp. v. U.S. Plywood–Champion Papers, Inc.*, 446 F.2d 295 (2d Cir.), *cert. denied*, 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971). While this type of proof is appropriate in most commercial infringement situations, this Court is not persuaded that it is the appropriate measure of damages here.

What the facts in this proceeding involve is an individual farmer, not a classic commercial patent infringer. There is abso-

lutely no proof that Mr. Wood intended to go into the seed business. What he did was infringe to save himself money. He did not sell seed to anyone. He gave half of the saved cottonseed to Mr. Trantham. It would be inconsistent with the monetary damages found in the reported decision in Mr. Trantham's case for Monsanto to acquire monetary damages against Mr. Wood based on its hypothetical model that presumes a permanent use right to the patent. There is no proof that Mr. Wood saved seed from his 2000 crop or any year other than 1999. Monsanto's suit against him was certainly a preventive to his doing so again, but the proof does not support an inference that Mr. Wood ever contemplated a permanent use. The Court has no doubt that Monsanto justifiably wishes to send a message to all farmers that it will pursue judgments, and nondischargeability, for any infringements. That message is present by the very fact that Mr. Wood has been pursued to this point.

■ Monsanto's expert proof, based on its hypothetical model, was that a reasonable royalty for the Bollgard® with Roundup Ready® cottonseed in 2000 would be $2,000 per 50 pound bag, and when applied to the 362.5 bags of saved seed, this would yield a royalty of $725,000. This is in contrast to Monsanto's other proof through Mr. Rylander that its normal royalty for such cottonseed in 2000 was $160 per 50 pound bag. If applied to the 362.5 bags, this $160–per–bag royalty would be $58,000. The best proof of the 2000 royalty, however, is the actual technology fee paid by Mr. Wood for the Bollgard® with Roundup Ready® cottonseed that he properly purchased in 2000. The invoice from Helena shows he paid $157 per bag technology fee, in addition to Helena's regular charge for the seed. If applied to the 362.5 bags, this would be a royalty of $56,912.50.

■ In addition to its hypothetically-based damage claim, Monsanto seeks treble enhancement under 35 U.S.C. § 284, a statute that gives the trial court discretion to enhance up to three times the amount of damages. Thus, Monsanto seeks a trebling of $771,621.23 for total damages of $2,314,863.60, plus Monsanto seeks its attorney fees, which exceeded $400,000 at the time of the post-trial briefs.

Mr. Wood's actions were willful and malicious. But, this Court is not persuaded that they were egregious, and the monetary penalty sought by Monsanto is simply too much. The Court has considered the factors for enhancement outlined in Monsanto's post-trial brief, and as found in *Johns Hopkins Univ. v. Cellpro, Inc.*, 152 F.3d 1342, 1364 (Fed.Cir.1998), in the light of the facts present in this proceeding:

1. Whether Wood deliberately infringed: The Court has found that he did willfully and maliciously infringe the cottonseed patents. This factor may support some enhancement.

2. Whether Wood investigated the scope and validity of the patent: There is no proof directly in point on this factor, but Mr. Wood defended the District Court suit on the basis that the patent was not enforceable. Although the District Court rejected those defenses, this Court has no basis to find that his defense was in bad faith, and this factor does not support enhancement.

3. Mr. Wood's behavior in this litigation: Monsanto points to Mr. Wood's persistent denial of his violation of its patents and the District Court's rejection of his and Mr. Trantham's defenses. There is no reason for this Court to penalize Mr. Wood for defending Monsanto's suit, other than to assess some or all of Monsanto's attorney's fees against him. His defense, in and of itself, is not a reason to enhance the

basic damages. The Court is concerned that Mr. Wood confronted one of the witnesses from the Charleston Gin, but there was no indication that he intimidated that witness. She in fact testified credibly against him. Overall, this factor does not support enhancement of damages.

4. Mr. Wood's size and financial condition: As the Court has observed, Mr. Wood is of retirement age, after 50 years of farming, and he is in chapter 7 bankruptcy. This factor does not support any enhancement of damages.

5. The closeness of the case: Monsanto asserts that Mr. Wood's infringement was not a close call at all. Probably not, but, as this Court has observed, whether the infringement was a willful and malicious injury is a close and difficult call, one that justified the Debtor in defending this litigation in the bankruptcy court. This factor does not support enhancement.

6. Duration of the infringement: Monsanto argues that this supports enhancement, based upon its presumption that Mr. Wood intended to continuously replant saved seed. But, there is no proof to support this. The infringement was wrong but it was limited to one crop year. There is no proof to indicate that Mr. Wood would have repeated the saving in the absence of Monsanto's intervention in the 2000 crop year. This factor does not support enhancement.

7. Remedial action by the infringer: Monsanto says there is no proof of Mr. Wood taking any remedial action, but that is a non-factor in this case. Since Monsan-

to acted quickly to sue Mr. Wood, there was no risk of continued infringement.

8. Mr. Wood's motivation for harm. Although the Court has found that Mr. Wood's infringement was willful and malicious, that is not the same as saying that Mr. Wood intended to put Monsanto out of business or to compete with it. This is a factor for enhancement consideration but not a factor that overcomes all other considerations.

9. Whether a concealment was attempted: Here, the factor favors some enhancement, since the Court has found that Mr. Wood did conceal his wrongful saving by his actions with the Charleston Gin and Sinkers.

■ After considering and weighing all of these factors and the totality of the damage proof, the Court finds that the actual 2000 royalty of $157 per bag, applied to 362.5 bags of saved cottonseed, totaling $56,912.50, is an appropriate damage award for Mr. Wood's infringement of the cottonseed patent.[7] The factors in favor of enhancement are outweighed by Mr. Wood's current age and financial condition; thus, the Court will not enhance the damage award. And, the Court does not find it appropriate to award pre-judgment interest, since the defense of the nondischargeability suit was a justifiable one. However, it is appropriate under the circumstances of this case and proceeding to award Monsanto's attorney's fees.

■ Monsanto has been required to expend a large amount of professional fees. Based upon the affidavits submitted, the Court finds the fees to the firm of Frilot,

---

**7.** It is important to note that Monsanto offered no proof about its share, or profit, that it would be paid from any distributor of its seed. For example, in 1999 and 2000 Mr. Wood purchased Bollgard® with Roundup Ready® cottonseed from Terra and Helena. In addition to the technology or royalty fee,

he paid a per bag charge for the seed, and no proof was presented on how much of the latter charge would be Monsanto's charge to the distributor. Thus, the Court has no basis upon which to find any damages to Monsanto for anything related to the 362.5 bags other than a royalty fee of $157.

Partridge, Kohnke & Clements, L.C. in the amount of $327,164 and its expenses of $60,116.13 to be reasonable, and the fees to the firm of Wyatt, Tarrant & Combs, LLP in the amount of $12,020.50 and its expenses of $1,852.50 to be reasonable. Those amounts shall be added to the $56,912.50 for a total damage award that shall be excepted from the Debtor's discharge under 11 U.S.C. § 523(a)(6).

A separate final order and judgment, consistent with this Opinion, will be entered, and that order shall contain a permanent injunction against Mr. Wood's future infringement of Monsanto's patents.